UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION


PIA COUCH,                                    )
               Plaintiff,              )
                               )
      vs.                                      )          1:09-cv-0768-RLY-MJD
                               )
SOUTHERNCARE, INC.,                           )
               Defendant.             )


**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Pia Couch ("Plaintiff"), is the former Clinical Director of SouthernCare,

Inc.'s ("SouthernCare") Kokomo, Indiana office.  Plaintiff alleges that SouthernCare

discriminated against her on the basis of race (African-American) and retaliated against

her when it terminated her employment in January of 2008.  SouthernCare now moves for

summary judgment.  For the reasons set forth below, the court **GRANTS** SouthernCare's

motion.

**I.**     **Factual Background**

     **A.**     **Background**

1.     SouthernCare is a hospice provider, with its home office and management in

          Birmingham, Alabama.  (Deposition of Pia Couch ("Plaintiff Dep.") at 41-42,

          105).

2.     SouthernCare provides its employees with an employee handbook which contains

          an anti-discrimination provision.  (Plaintiff Dep. at 60).

3.     The handbook also provides that the acts related to sexual or any form of harassment are examples of gross misconduct.  (Plaintiff Dep. at 70). SouthernCare's 2006 employee handbook provided that incidents of gross misconduct will result in discipline up to and including immediate termination. (Plaintiff Dep. at 122).

4.     Plaintiff is a registered nurse, who was hired by SouthernCare as Clinical Director on August 18, 2005.  (*Id*. at 18, 38-39).  As the Clinical Director, Plaintiff's responsibilities included coordinating patient care, coordinating and running care plan meetings with other staff, educating and training the clinical staff, and communicating with hospitals and nursing homes about the patients.  (*Id*. at 40-42).

5.     Jan Offutt ("Offutt") was employed at SouthernCare as a Community Relations Director from February 2, 2004, through June 8, 2009.  (Deposition of Jan Offutt ("Offutt Dep.") at 9-10).  She was in charge of the marketing staff, admission coordinators, and the volunteer coordinators.  (Offutt Dep. at 20).  Plaintiff and Offutt were peers in SouthernCare's Kokomo office, and were the two highest ranking SouthernCare employees in the Kokomo office on a daily basis.  (Plaintiff Dep. at 48-49).

6.     Tara Knapp ("Knapp"), a Regional Director, was Plaintiff's boss.  (Plaintiff Dep. at 44, 50).  Knapp was in the Kokomo office a few days every other week. (Plaintiff Dep. at 47-48).

7.     Melanie Phillips ("Phillips") was a Clinical Assistant and one of Plaintiff's subordinates.  (Plaintiff Dep. at 49).

### B.     Plaintiff's Work Performance

8.     The purpose of SouthernCare's "Employee Counseling Form" is to document needed improvement, and if necessary, to start the sequence of events that may lead to termination.  (Plaintiff Dep. at 131).  The Employee Counseling Form and Corrective Action Plan are used when an employee does something that violates the rules of SouthernCare or when an employee repeatedly fails to meet expectations within the office.  (Plaintiff Dep. at 131-32).

9.     During Plaintiff's employment with SouthernCare, she received an Employee Counseling Form in November 2006 for improper conduct at a business luncheon. Present for the luncheon were Robinne Harris ("Harris"), a Regional Director, Jeff Lang ("Lang"), Division President, and Robert Smoot ("Smoot"), Offutt's supervisor.  The Employee Counseling Form states that Plaintiff "tapped" Smoot "in the back of the head due to displeasure of statements made by Smoot." (Plaintiff Dep. Ex. 19-20).  In March 2007, Plaintiff received an Employee Counseling Form and Corrective Action Plan, noting that Plaintiff needed to treat customers with respect and address complaints from vendors, employees, and the corporate office.  (Plaintiff Dep. Ex. 21).  In August 2007, Plaintiff received an Employee Counseling Form for releasing confidential employee information to an outside employer.  (Plaintiff Dep. Ex. 22).

10. In 2004, 2006, and 2007, Plaintiff received pay raises from SouthernCare. (Plaintiff Dep. Exs. 11-14).

11. On December 12, 2007, Plaintiff received a favorable employee evaluation, noting her improved overall job performance and "[s]trong motivation for success." "Pia's efforts have allowed the Kokomo office to pass a more difficult, corporate compliance survey." (Plaintiff Dep. Ex. 14).

12. During her employment with SouthernCare, Plaintiff never received any reduction in pay, and her vacation privileges were never taken away. (Plaintiff Dep. at 119-20).

### C. Events Leading to Plaintiff's Termination

13. In December 2007, SouthernCare had a "Hotline" available to SouthernCare's customers and employees, whereby complaints could be received anonymously about anything related to SouthernCare's business or employment practices. (Declaration of Richard Duren ("Duren Dec.") ¶ 5).

14. On December 14, 2007, SouthernCare received an anonymous letter, dated December 8, 2007. (Defendant's Ex. E at 315-17; Duren Dec. ¶ 6). The letter was received in Birmingham via SouthernCare's Corporate Compliance Hotline, and submitted to SouthernCare's Compliance/Privacy Officer, Brenda Wright ("Wright"). (Defendant's Ex. E at 266; Duren Dec. ¶ 6). The anonymous letter stated:

I will be filing a complaint against your company and your clinical director

with the department of labor if you do not remove her immediately. She hit's (sic) her employee's (sic) leaving bruise (sic) on one RN, screams profanities, (sic) at employees, gropes her employees sexually, uses fear and intimidation to run her office, belittles her employees, and threatens to fire employees who do not bring in referrals. This individual has no business being in a position of authority. She gives employees no guidance when asked (sic) preferring to state that she does not have time to help. She is crude (sic) vulgar (sic) and a disgrace to her profession.

(Defendant's Ex. E at 317).

15.    In response to the Hotline complaint, Wright and Richard Duren, SouthernCare's

Director of Risk Management and Human Resources, traveled to SouthernCare's

Kokomo, Indiana, office to investigate the Hotline complaint. (Defendant's Ex. E

at 256; Defendant's Ex. F at 267; Duren Dec. ¶ 7).

16.    On January 6 and January 7, 2008, Wright and Duren interviewed a total of 34

employees in the Kokomo office. (Defendant's Ex. E at 250, 267-68; Duren Dec.

¶ 7). The questions were developed prior to the interview, and were memorialized

contemporaneously with the interviews through Wright's handwritten notes.

(Defendant's Ex. E at 279-314; Duren Dec. ¶ 11). The results of the employee

interviews and investigation were summarized in an 11-page report completed by

Wright and given to SouthernCare management on January 14, 2008.

(Defendant's Ex. E at 250, 267-77; Duren Dec. ¶ 13).

17.    The documentation of the employee interviews, with handwritten notes, and the

preparation of the summary report based on the interview notes, were all done

pursuant to SouthernCare's regular business practice following Hotline complaint

investigations. (Duren Dec. ¶ 14).

18.     As to question one, regarding whether employees felt they had been the subject of

a hostile or offensive work environment, the responses included:

*       "Intimidated sometimes"

*       "We are afraid of retaliation if we say anything."

*       "I have been subjected to tongue lashings by Pia in front of others."

*       "She hits and grabs me. . . . Pia seems to feel comfortable touching people
        in inappropriate places . . . .  Her sense of humor is sexual – in front of
        others."

*       "I actually had a bruise from being hit.  I told Pia and she just laughed."

(Defendant's Ex. E at 271-72).

19.     As to question two, regarding whether employees had ever heard, witnessed, or

been subjected to sexual advances in the workplace, the responses included:

*       "Pia will grope another nurse's breasts. . . .   Pia bought this nurse a
        vibrator for Christmas.  Pia puts pencils down between this nurse's
        legs and rubs her breast.  No relationship between them.  The
        vibrator was the teal color of SouthernCare.  Called the nurse (M)
        petrified crotch.  Pia had everyone sign the box the vibrator came in
        – no one that I knew of went to her and refused.  Fear of what would
        happen to them."

*       "Inappropriate touching by Pia – to Melanie."

*       "Some inappropriate touching and joking by Pia to Melanie.  Also saw Pia
        grabbing Melanie's breasts.  She said she called her 'ms. prude' and told
        her she has to sign the Christmas gift she got for Melanie."

(Defendant's Ex. E at 272).

20.     As to question three, regarding whether employees had heard, witnessed, or been

subjected to unprofessional or inappropriate behavior by a manager, the responses included:

*   "I got kicked in the butt by Pia but I did not say anything to Pia.  It only happened once – in December.  It was hard and hurt."

*   "Called a nurse 'piss poor nurse' (Robin).  Pia has been this way to me and to others dozens and dozens of times."

*   "Playfulness by Pia that went too far.  Smacked on butt while I was bending over putting paper in the copier.  Pia hits hard.  I told her it hurt."

*   "No secret that the CD can get rude.  She says 'shut-up' to everyone."

*   "Lots of discussion not work appropriate by Pia."

*   "Monday morning meetings: Pia has thrown things at people, i.e. pens.  I don't know why."

*   "Lots of unprofessional language.  Pia has a sexual sense of humor and does embarrass me."

*   "Pia grabbing breast or butt – I should have seen it happen to another female."

*   "Yelled at.  The manager should not do this in front of others."

(Defendant's Ex. E at 273).

21.    As to question four, regarding whether employees ever witnessed a manager speaking to another in a belittling or derogatory way, the responses included:

*   "Pia's management style is to openly criticize in a group about the way we are/should be behaving."

*   "Just heard about it."

*   "There is a fear management style in this office."

   *   "Made me feel small.  Criticized in a hateful way.  I see this with others as well."

   *   "Pia is very belittling to nurses after on-call if they did not make a good call.  Does this in front of all in Monday morning meeting.  Rolls her eyes.  Recently told a nurse (R) that she was a 'piss poor nurse' and asked someone to take over the meeting because she (Pia) could not continue the meeting."

   *   "In Monday morning meetings tells us to 'shut-up.'. . .  Pia throws things."

(Defendant's Ex. E at 274-75).

22. As to question five, whether employees have ever heard or witnessed a manager using profanity in the office, the responses reflected that Plaintiff (and some of the other office staff) has used profanity, including the "F" word, in the office. (Defendant's Ex. E at 275-76).

23. As to question six, regarding what are the employees' opinions of their work environment, the responses included:

   *   "I love it here X4."

   *   "I don't like to come in the office.  It's hectic and stressful.  Very high expectations.  I do love my job."

   *   "I love hospice.  It's what I do.  There has been a change in behavior (Pia).  I have thought about leaving."

   *   "It's family like – but dysfunctional."

   *   "Very strained because of Pia's management style.  Everyone is tense in the office."

   *   "More stressful in the past couple of years.  More because of Pia's mood not because of job."

\*      "Gets a little stressful."

\*      "Fantastic."

\*      "I think its great here."

(Defendant's Ex. E at 276-77).

24.    On January 12, 2008, after Wright and Duren conducted their investigation into the Hotline complaint, SouthernCare received some follow-up emails from two employees from the Kokomo office. (Defendant's Ex. E at 319, 324). Both employees complained that the work environment had gotten worse since the investigation. One employee described the Kokomo office as a "walking time bomb" and asked SouthernCare to "send help soon or pay another visit." (Defendant's Ex. E at 319). Another employee complained that since the investigation, the employees had experienced "more stress and behaviors out of Plaintiff," such as Plaintiff not speaking to employees, keeping her door closed, and glaring at others. (Defendant's Ex. E at 324).

25.    After the investigation, Wright and Duren reported their findings to Harris and Roberta Wilson ("Wilson"), a SouthernCare Vice President. (Defendant's Ex. E at 250). Thereafter, Wilson, in the Birmingham office, made the decision to terminate Plaintiff. (Second Declaration of Richard Duren ("Second Duren Dec.") ¶ 4).

26.    On January 14, 2008, Harris and Knapp informed Plaintiff that she was terminated due to poor management and harassment of employees. (Plaintiff Dep. at 142;

Defendant's Ex. E at 1; Duren Dec. ¶ 16 (testifying that Plaintiff's act of "securing a sexual device for a coworker and requiring employees to sign it" was one of the reasons for her termination). Plaintiff's change in status is reflected on SouthernCare's Employee Information/Status Change form, which was signed by Knapp. (Defendant's Ex. E at 1).

27. Plaintiff admitted in her deposition that she grabbed Phillips' breasts on multiple occasions; admitted that she took a pencil and put it between Phillips' legs at work; and admitted that she purchased a vibrator as a gift for Phillips and had everyone in the office sign it. (Plaintiff Dep. at 71-74, 77, 117). Plaintiff testified that she and Phillips were friends, and that, in her opinion, her behavior toward Phillips was not harassing. (Plaintiff Dep. at 74-75) (testifying that this was not harassing behavior because "you aren't hearing both sides of the story. It kind of sounds like I just walked up to her and grabbed her, and that's just not the way it was."). However, Plaintiff acknowledged that these acts could be considered gross misconduct under SouthernCare's employee handbook. (Plaintiff Dep. at 77-78).

28. Plaintiff also admitted to many of the other complaints expressed by her co-workers during the Hotline interviews. For example, she admitted to swatting Robin Gonzalez on the bottom (which left a bruise); admitted to swearing in the office; and admitted that she "had been told that people felt like I raised my voice" at work. (Plaintiff Dep. at 73, 108, 112).

**D.      Allegations Concerning Similarly Situated Co-Workers**

**1.      Jan Offutt**

29.    Plaintiff testified that she and Offutt sat on each other's laps and that they swatted each other on the bottom.  (Plaintiff Dep. at 189).

30.    Plaintiff does not know whether any member of SouthernCare complained about that conduct, nor whether any member of management ever saw Offutt engage in that conduct.  (Plaintiff Dep. at 188).

31.    Plaintiff and Offutt gave Offutt's supervisor, Smoot. a sex toy (a blow up doll) in front of Plaintiff's supervisor (presumably Harris), a Vice President, and SouthernCare CEO, Michael Pardy ("Pardy").  (Plaintiff Dep. at 154).

32.    Plaintiff testified that she has no knowledge as to whether anyone from the SouthernCare home office in Birmingham was aware of the sex toy given to Smoot.  (Plaintiff Dep. at 106).

33.    Offutt admits to "pretending" to grab other employees' breasts in a joking manner. (Offutt Dep. at 42). Offutt testified that it was all in "fun."  (Offutt Dep. at 44).

34.    Neither Plaintiff nor anyone else complained about Offutt allegedly "grabbing" other employees' breasts.  (Plaintiff Dep. at 103).

**2.      Robinne Harris**

35.    Plaintiff testified that Pardy was present at a Christmas party wherein Harris grabbed the buttocks of Steven DeFranco from SouthernCare's marketing department.  (Plaintiff Dep. at 62; *see also* Offutt Dep. at 64 ("I recall on several

occasions when [Harris] would get tipsied, that her behavior was inappropriate with grabbing butts.").  Plaintiff did not complain to anyone about this incident. (Plaintiff Dep. at 79).

36. At some point, Harris lifted up her shirt and showed her belly ring (it is not clear when and/or to whom this was done).  Plaintiff orally complained to Knapp and Lange.  (Plaintiff Dep. at 80).

### E.    The Caring Hands Allegations

37. Caring Hands, a nursing home, and SouthernCare had a contract wherein SouthernCare employees performed services for patients at Caring Hands. (Plaintiff Dep. at 161, 169).

38. Sometime prior to June 2005, the owner of Caring Hands, Ray Maggard ("Maggard"), became angry with Plaintiff, and made a complaint to the corporate office.  (Plaintiff Dep. at 161, 168).

39. The situation snowballed when one of Plaintiff's subordinates told Plaintiff that Maggard referred to Plaintiff as a "nigger."  (Plaintiff Dep. at 161-62).

40. Plaintiff thereafter retained counsel to file a charge of discrimination in June 2005 against Caring Hands.  (Plaintiff Dep. at 166-68; Plaintiff Dep. Ex. 27).  Plaintiff's counsel directed the letter to Harris of SouthernCare.  (Plaintiff Dep. at 168; Plaintiff Dep. Ex. 27).

41. After receiving the letter, Harris, Lange, Offutt and Plaintiff had a meeting about what Maggard had reported to the SouthernCare Corporate office about Plaintiff.

(Plaintiff Dep. at 169). Plaintiff testified that Harris supported Plaintiff, but that Lang did not. (Plaintiff Dep. at 169). Plaintiff never went back to that facility again. (Plaintiff Dep. at 169).

42.     The last time Plaintiff had any issues related to the Caring Hands facility was during her 2006 employee performance evaluation. (Plaintiff Dep. at 185).

## II.     Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *Heft v. Moore*, 351 F.3d 278, 283 (7th Cir. 2003). The moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-moving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994) (citing *Celotex*, 477 U.S. at 322).

## III.  Discussion

### A.    Plaintiff's Race Discrimination Claim

Plaintiff alleges that her termination was racially motivated, in violation of 42 U.S.C. § 1981 ("Section 1981").  Claims brought under Section 1981 are analyzed under the same framework as claims brought under Title VII.  *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 299 (7th Cir. 2004).  Plaintiff proceeds under the indirect method of proof, which requires her to show: (1) she was a member of a protected class; (2) she was meeting her employer's legitimate job expectations; (3) she suffered an adverse employment action; and (4) similarly situated individuals outside of her protected class were treated more favorably.  *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004).  If Plaintiff establishes a prima facie case of discrimination, the burden of production falls on SouthernCare to demonstrate a legitimate, non-discriminatory reason for its employment action.  *Id.* Once SouthernCare articulates a legitimate, non-discriminatory reason for its employment action, the burden shifts back to Plaintiff to establish that SouthernCare's stated reason for her termination was pretextual. *Id.*  Plaintiff easily satisfies the first and third prongs of her prima facie case, as she is an African-American female who was terminated.  The issue of whether Plaintiff was meeting her employer's legitimate job expectations, the third prong, is a matter of dispute, and is more appropriately addressed in the pretext analysis.  *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999) (court can assume that the plaintiff has met the "legitimate expectations" element of the prima facie test where that element

14

dovetails with the issue of pretext). Accordingly, the court will address the fourth prong, i.e., whether similarly situated individuals outside the protected group were treated more favorably than Plaintiff.

### 1. Similarly Situated Individuals

#### a. Knowledge of Offutt's and Harris' Alleged Conduct

Plaintiff's race discrimination case requires her to show that the decision-maker in this case, Wilson, evinced an intent to discriminate against Plaintiff when she made the decision to terminate Plaintiff. *See Davis*, 368 F.3d at 786. Here, Plaintiff presents no evidence to show that Wilson was ever apprised of the alleged inappropriate conduct of Offutt and Harris. Plaintiff never complained to anyone about Offutt's conduct, and complained only once to Knapp and Lang about Harris' conduct – i.e., lifting up her shirt at a picnic. With respect to the sex toy that was given to Smoot, Plaintiff acknowledged that no one from the SouthernCare Birmingham corporate office was aware of this event. The Hotline complaint investigation was handled by SouthernCare employees from Birmingham, Alabama, and the decision to terminate Plaintiff was made only with the participation of SouthernCare employees from Birmingham. Without evidence that Wilson knew of Offutt's or Harris' conduct that Plaintiff identifies in her Response, Plaintiff cannot point to comparative evidence to support her claim that Wilson intentionally discriminated against her. For Plaintiff to establish that Wilson made a conscious decision to treat Offutt and Harris more favorably than Plaintiff, at a minimum, Plaintiff must show that Wilson was aware of Offutt's and Harris' conduct at the time of

15

her termination.  *See Pressley v. Haeger*, 977 F.2d 295, 297 (7th Cir. 1992) ("Racial discrimination is an intentional wrong.  An empty head means no discrimination.").  As she cannot, Plaintiff has no comparative evidence and cannot establish her intentional discrimination claim.

### b. Similarly Situated Individuals

Even if Wilson was aware of Offutt's and Harris' conduct before she made the decision to terminate Plaintiff, the conduct of Offutt and Harris is not comparable to that of Plaintiff.

The similarly situated prong "'normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"  *Humphries v. CBOS West, Inc.*, 474 F.3d 387, 404-05 (7th Cir. 2007) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)).  "[T]he similarly situated inquiry is a flexible one that considers 'all relevant factors, the number of which depends on the context of the case.'"  *Humphries*, 474 F.3d at 405 (quoting *Radue*, 219 F.3d at 617)).  An employee need not show complete identity in comparing herself to a more favorably-treated employee; substantial similarity is sufficient.  *Id*.  In other words, the court's inquiry is whether there are "enough common factors between the individuals to allow a meaningful comparison[.]"  *Id*. (citing *Chavez v. Ill. State Police*, 251 F.3d 612, 636 (7th Cir. 2001)); *see also Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)

(employee and his alleged comparator must have a "comparable set of failings"); *Grayson v. O'Neill*, 308 F.3d 808, 819 (7th Cir. 2002) (employee's white comparators were not similarly situated because employee was the subject of far more complaints regarding his conduct than his white counterparts).

Assuming that Offutt and Harris engaged in the conduct Plaintiff alleges, their conduct did not have the same impact on others. There is no evidence that any SouthernCare employees made any Hotline complaints about Offutt's or Harris' alleged conduct. Plaintiff herself did not make any such complaints. Other than Plaintiff informing Knapp and Lang about Harris lifting her shirt, there is no evidence that anyone at SouthernCare complained about any of Offutt's or Harris' conduct. On the other hand, Plaintiff's conduct led to a written Hotline complaint to the SouthernCare corporate office, wherein the author threatened to report SouthernCare to a federal agency. As a result of this complaint, SouthernCare conducted a thorough investigation in which multiple employees complained about Plaintiff's conduct. The complaints included allegations that Plaintiff was physically or verbally abusive, intimidating, rude, moody, dismissive, and inappropriately touched other employees. After the interviews, SouthernCare received two emails from employees in the Kokomo office complaining of the unsustainable work atmosphere. There is no evidence that the alleged conduct of Offutt and Harris had anywhere near the impact on SouthernCare's employees that Plaintiff's conduct had. Moreover, there is no evidence in the record that Offutt or Harris received Employee Counseling Forms from SouthernCare for their behavior.

Accordingly, Plaintiff fails to establish a prima facie case of race discrimination.

### 2. Pretext

According to Plaintiff's Employee Information/Status Change Form, she was terminated due to "poor management and harassment of employees." This is a legitimate, non-discriminatory reason for SouthernCare's decision to terminate Plaintiff. Thus, Plaintiff must now come forward with evidence that SouthernCare's decision to terminate her employment is a pretext for discrimination.

Plaintiff contends that she was living up to SouthernCare's legitimate expectations at the time of her termination. Plaintiff cites to her positive employee evaluation, dated just two days before SouthernCare received the Hotline complaint that precipitated the investigation. The evaluation was done by Knapp, who was not in the office on a day-to-day basis. In addition, the evaluation addressed Plaintiff's job skills, and was performed before the employee grievances came to light. These grievances were serious in nature, and revealed that Plaintiff had violated SouthernCare's workplace rules. According to SouthernCare's employee handbook, a violation of these rules is grounds for termination. Thus, in light of Plaintiff's complete employment record, Plaintiff's termination for her poor management skills and harassment of employees is supported by the record.

Plaintiff also contends that SouthernCare focused only on the negative responses to the Hotline complaint investigation, while ignoring the positive responses. The thrust of Plaintiff's argument seems to be that as long as a majority of SouthernCare's employees had no complaints against Plaintiff, SouthernCare could not terminate her.

(The evidence reflects, for example, that 15 out of 33 employees felt that they were subjected to a hostile working environment. (Defendant's Ex. F at 268)). The court's pretext inquiry focuses on whether the employer's reason for the employment decision was honestly held, and not whether it was the "correct" decision. *See Grayson*, 308 F.3d at 820 (stating that in ruling on the issue of pretext, the court's function is not to weigh the correctness of the employer's decision, but to determine whether the employer honestly believes in the reasons it offers); *Pitasi v. Gartner Group, Inc.*, 184 F.3d 709, 718 (7th Cir. 1999) ("[I]t is not sufficient for the employee to show that his employer fired him for incorrect or poorly considered reasons. He must establish that the employer did not honestly believe the reasons it gave for terminating him."). Plaintiff presents no evidence to show that SouthernCare did not honestly believe the reasons advanced in support of Plaintiff's termination. In the absence of such evidence, Plaintiff's argument fails.

Finally, Plaintiff argues that SouthernCare's failure to follow its own termination policies shows its decision to terminate Plaintiff was pretextual. In support of her argument, she attaches what she represents are SouthernCare's termination procedures. This document is inadmissible hearsay and is not properly authenticated. Thus, the court need not consider it. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) (evidence relied upon in summary judgment must be of the type otherwise admissible at trial).

Even were the court to consider it, however, Plaintiff has brought forth no evidence to show that SouthernCare's failure to follow its termination procedures

suggests discrimination. First, Plaintiff was an at-will employee, and as such, SouthernCare could terminate her employment at any time for any legitimate reason. (Defendant's Exs. 4, 5). Second, Plaintiff offers no evidence that SouthernCare rigorously enforced its termination procedures. *See Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007) (plaintiff failed to show pretext where she was an at-will employee, and offered no evidence to show that her employer's termination procedures were rigorously enforced). For this, and for the reasons set forth above, the court finds that Plaintiff fails to carry her burden to show that SouthernCare's decision to terminate her employment was a pretext for discrimination. Defendant's motion for summary judgment on Plaintiff's Section 1981 race discrimination claim is **GRANTED**.

## B. Retaliation

Plaintiff claims that SouthernCare retaliated against her for filing a charge of discrimination with the Equal Employment Opportunity Commission in June 2005. Plaintiff proceeds under the indirect method of proof, which requires her to show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; (3) she was performing her job satisfactorily; and (4) she was treated less favorably than a similarly situated employee who did not complain of discrimination. *Leonard v. E. Illinois Univ.*, 606 F.3d 428, 431 (7th Cir. 2010) (quoting *Stephens v. Erickson*, 569 F.3d 779, 786-77 (7th Cir. 2009)). Here, Plaintiff brings forth no evidence to establish the fourth prong of her prima facie case. Moreover, the statutorily protected activity of which she complains happened years before her termination. *Everroad v. Scott*

*Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010) (one-year time delay, in the absence of any other evidence, is far too long to establish causal connection between the protected activity and the adverse employment action); *Haywood v. Lucent Techs., Inc.*, 323 F.3d 524, 531 (7th Cir. 2003) (same). In between that time, she received merit increases in both 2006 and 2007, and did not suffer any adverse employment action after the Maggard/Caring Hands incident. In sum, the evidence reflects that Plaintiff's termination was not motivated by Plaintiff's proposed discrimination charge against Caring Hands. Defendant's motion for summary judgment on Plaintiff's Section 1981 retaliation claim is **GRANTED**.

## IV.    Conclusion

Plaintiff fails to establish a genuine issue of material fact with respect to her race discrimination and retaliation claims. Accordingly, Defendant's motion for summary judgment (Docket # 47) is **GRANTED**.


**SO ORDERED** this  3rd   day of March 2011.

RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana


Electronic Copies to:

Jason Porter Cleveland                              John H. Haskin
HASKIN & LARUE                                   HASKIN & LARUE
jcleveland@hlllaw.com                              jhaskin@hlllaw.com

Jennifer Jay Kalas
HINSHAW & CULBERTSON
jkalas@hinshawlaw.com

Meghan Uzzi Lehner
HASKIN & LARUE
mlehner@hllglaw.com

Renee J. Mortimer
HINSHAW & CULBERTSON
rmortimer@hinshawlaw.com